UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No. 3:03CR178 (RNC) |
| : | |
| CHAUNCEY MOORE : | |
| : | February 3, 2006 |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION
TO THE DEFENDANT'S MOTION TO SUPPRESS**

The government submits this supplemental memorandum in response to questions raised by the Court in the telephone conference of December 2, 2005 and in response to the supplemental memorandum of the defendant dated January 13, 2006.

During the telephone conference, the Court questioned whether a remedy was called for in this case if it were to decide that the defendant's statements to a Norwalk police sergeant and an agent of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives concerning the location of his gun violated his Sixth Amendment rights vis-a-vis the charges that were pending against him in state court at the time he made the statements. The Court noted its agreement that the charge in this case is not the same offense as those that the defendant was charged with in state court at the time he made the statements in issue. In formulating this ultimate question, the Court also asked the following subsidiary questions: "[W]hen does the Constitutional violation happen? When the officer elicits the statement outside the presence of counsel or when the statement is offered by the prosecutor at trial? Transcript Telephone Conference, December 2, 2005, at 12.

The short answer to these questions is that no remedy is appropriate here because there is no constitutional violation for this Court to redress. The Supreme Court has made clear that the Sixth Amendment affords offense-specific protection. It does not prevent officers from engaging in the important task of investigating uncharged crimes, even if the uncharged crimes are factually related to crimes for which a defendant has already been charged. Indeed, the Supreme Court has expressly recognized that, in such circumstances, evidence of uncharged crimes obtained outside the presence of counsel is admissible in prosecutions of those crimes, even if it might not be admissible in a prosecution of crimes that were already charged at the time the statements were made. Here, given the lack of identity between the state charges that were pending against the defendant when the statements at issue were made and the subsequently filed federal charges, statements made by the defendant are admissible in the federal case.

Before addressing the Court's questions in more detail, though, the government addresses an issue arising from a recent Connecticut case that is dispositive of all the defendant's Sixth Amendment claims.

I.  Recent Authority from the Connecticut Supreme Court Establishes that the Defendant's Sixth Amendment Rights Did Not Attach with Respect to the State Crimes for which He Had Been Arrested.

As a preliminary matter, the government calls the Court's attention to a case decided by the Connecticut Supreme Court within the last few days that undercuts an assumption the parties have been operating under here – namely, that the defendant's Sixth Amendment rights had attached with respect to the state charges for which he was arrested.

In *State v. Pierre*, 277 Conn. 42, 2006 WL 176944 (Jan. 31, 2006), the Connecticut Supreme Court examined the Connecticut procedure of having a state prosecutor sign an

information as part of an arrest warrant package, and held for the first time that a defendant's constitutional right to counsel under the Sixth Amendment does not attach upon the signing of the information, but rather only when the information is filed with the court at the defendant's arraignment. *Id*. at *25. The court held that the mere signing of an information accompanying an arrest warrant does not commit the state to prosecuting a defendant, and therefore cannot be considered to be the commencement of adversary judicial proceedings needed for the Sixth Amendment right to counsel to attach. *Id*. The court held that only upon the filing of the information at a defendant's arraignment is the commitment to prosecute made, adding:

> It is at this point in the process that the 'prosecutorial forces of organized society' aligned against the defendant, and the defendant actually found himself 'immersed in the intricacies of substantive and procedural criminal law,' thus warranting protection under the sixth amendment.

*Id*. (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)). The holding in Pierre is consistent with federal case law interpreting when the Sixth Amendment right to counsel attaches. The Second Circuit has held that the Sixth Amendment right to counsel does not arise on an arrest pursuant to a complaint. *See United States v. Duvall*, 537 F.2d 15, 22 (2d Cir. 1976) (Friendly, J.).

Here, at the time Sergeant Pine and Agent Campanell spoke with the defendant – at the defendant's initiation – the defendant had not yet been arraigned, so there had been no formal commitment at that time by the state to proceed with the prosecution, according to the holding in *Pierre*. Under *Pierre*, formal adversary proceedings had not yet been commenced against the defendant, so his Sixth Amendment right to counsel on the state charges had not yet attached. *See United States v. Pace*, 833 F.2d 1307, 1312 n.3 (9th Cir. 1987) (the question of when a state prosecution commences for Sixth Amendment purposes is itself a question of state law). Absent

3

a Sixth Amendment right to counsel, defendant obviously cannot now be heard to claim that his Sixth Amendment rights were somehow violated in the course of his discussion with Sergeant Pine and Agent Campanell.

Accordingly, the defendant's request for suppression based on an alleged violation of his Sixth Amendment rights should be denied.[1]

II. Even If the Defendant Had a Sixth Amendment Right to Counsel with Respect to the State Crimes, He Still Would Not Be Entitled to Any Relief Here.

Although the *Pierre* case makes clear that the defendant never had a Sixth Amendment right at the time of the questioning in issue, the government nevertheless has addressed below the issues raised by the Court in the Telephone Conference. In sum, even if the defendant's Sixth Amendment right had attached with respect to the state charges, he still would not be entitled to any relief here because the federal crime charged in this case is not the same offense and was not charged at the time the defendant spoke with Sergeant Pine and Agent Campanell.

A. There is No Sixth Amendment Violation Here, So No Remedy is Called for in These Circumstances.

The Supreme Court has made abundantly clear that the Sixth Amendment right to counsel is "offense specific." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). The Sixth Amendment "cannot be invoked once for all future prosecutions." *Id*. at 175. To the extent there was any lack of clarity, the Supreme Court forcefully reiterated this point in rejecting a claim that the

---

[1] It is worth noting that defendant's charge that his arraignment was improperly delayed would not change the fact that, under *Pierre*, his Sixth Amendment right had not attached with respect to the state crimes when he spoke with Sergeant Pine and Agent Campanell. Moreover, as previously noted, the defendant's claim that his arraignment was improperly delayed is inconsistent with Connecticut law permitting arraignment the day after arrest. *See State v. Piorkowski*, 43 Conn. App. 209, 215-218 (1996) (citing cases).

4

Sixth Amendment protection extends to crimes that are factually related to the charged offense, holding that "our decision is *McNeil v. Wisconsin* . . . meant what it said, and that the Sixth Amendment right is 'offense specific.'" *Texas v. Cobb*, 532 U.S. 162, 165 (2001).

In *Cobb*, an individual reported that his home had been burglarized and that his wife and daughter were missing. A neighbor, Levi Cobb, gave a written statement confessing to the burglary, but denying any knowledge of the disappearance of the two residents of the burglarized house. He was later arrested and charged with burglary, and counsel was appointed to represent him on that charge. Thereafter, the police received information that the defendant had confessed to his father that he had killed the two people who were in the house he had burglarized. The defendant was then arrested for murder, waived his *Miranda* rights, and, in the absence of counsel, was questioned by police and confessed that he had committed the murders. *Cobb*, 532 U.S. 165-66.

At his murder trial, the defendant in *Cobb* claimed that the police's questioning of him about the murders without his counsel being present was a violation of his Sixth Amendment rights because he was represented by counsel on the burglary charge. *Cobb*, 532 U.S. at 166-67. The Supreme Court rejected this argument on the ground that the burglary and murder charges were not the same offenses, adopting a straightforward test that makes the Sixth Amendment applicable to charged offenses as well as other offenses that would be considered the same offense under *Blockburger v. United States*, 284 U.S. 299 (1932). *Cobb*, 532 U.S. at 173. The Court determined that this test would effectively implement the protections of – and the limitations on – the applicability of the Sixth Amendment's offense-specific protections.

The Supreme Court took the opportunity in *Cobb* to knock down a theory that had been accepted by a number of lower courts that, if the charged and uncharged offenses are "factually related," then the Sixth Amendment protection applicable to the charged offense also covers the uncharged conduct. *Id*. at 168. The Court derided such a test, which was advocated by the *Cobb* dissenters, as being inherently vague and creating the type of uncertainty that would frustrate legitimate police investigations of uncharged crimes. "Deterred by the possibility of violating the Sixth Amendment, police likely would refrain from questioning certain defendants altogether." *Id*. at 173.

One of the principal reasons why the Sixth Amendment is confined to specific charged offenses is that "it is critical to recognize that the Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, *even those who have been charged with other offenses*." *Id*. at 171-72 (emphasis added). "[T]he ready ability to obtain uncoerced confessions is not an evil but an unmitigated good." *Id*. at 172.

The Supreme Court has long recognized the importance restricting the applicability of the Sixth Amendment's protection so as not to impede ongoing investigations of uncharged criminal conduct. For instance, in *Maine v. Moulton*, 474 U.S. 159 (1985), the Court addressed the question of the propriety of police interaction with charged defendants where the interaction included the investigation of other uncharged crimes. *Id*. at 178-80. There, the uncharged crimes being investigated included possible threats to an individual who was a witness to the charged crimes. *Id*. at 178. The Supreme Court in *Cobb* quoted at length from the *Moulton* opinion on this point:

> "The police have an interest in the thorough investigation of crimes for which *formal charges* have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and *formally charged* with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to *pending charges,* however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused . . . . On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities."

*Cobb*, 532 U.S. at 170 (quoting *Moulton*, 474 U.S. at 179-80 (emphasis added, footnote omitted)).  Indeed, the *Moulton* Court expressly noted that, while inculpatory statements as to the charged crimes would be inadmissible in a trial of those crimes, "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses."[2]  *Moulton*, 474 U.S. at 180 n.16.

The question for this Court is whether evidence and statements obtained based on discussions initiated by the defendant with a police sergeant, who was not participating in the investigation of the crimes charged by the state, and with a federal ATF agent, who was there solely to evaluate the possibility of as-yet uncharged federal crimes, should be suppressed in a

---

[2] Then Associate Justice Rehnquist, who later authored the majority opinion in *Texas v. Cobb*, joined Chief Justice Burger's dissenting opinion in *Moulton*, which would have gone farther and held that where the police engage in legitimate investigation of uncharged crimes, and there is no showing of bad faith that it was done to circumvent the Sixth Amendment protection, then those statements should be admissible at the trials of both the pending charges and the charges as to which the Sixth Amendment had not attached at the time of the investigative actions. 474 U.S. at 185-89 (dissenting opinion). Moreover, even assuming a Sixth Amendment violation, the *Moulton* dissenters would not have applied the exclusionary rule where the conduct allegedly violating the Sixth Amendment was for legitimate police investigation and was not done for the purpose of building the case on the pending charges. *Id*. at 192.

subsequent federal case involving an offense that is not the same as the state charges? Supreme Court precedent dictates that the answer is no. There is no question that the federal charges before this Court were not pending at the time the defendant made the statements to Sergeant Pine and Special Agent Campanell concerning the whereabouts of his gun. Nor does there appear to be any real disagreement with the fact that the federal charges here are not the same offenses under the *Blockburger* test as those charged by the state. Accordingly, under the offense-specific test enunciated in *McNeil* and *Cobb*, there is no Sixth Amendment violation here for the Court to redress. And the Supreme Court has made plain in cases like *Moulton* that where evidence of other uncharged crimes is obtained, it is admissible in a later trial of those charges, even if it might not be admissible at the trial of the charges that were pending at the time. *See Moulton*, 474 U.S. at 179-80 & n.16. The fact that the same evidence might be admissible in one trial but not another answers the Court's subsidiary question of when a violation (if any) occurs. Any violation of the Sixth Amendment would occur only if and when the evidence is admitted at a trial of the offenses that were already charged at the time the statements were made.

Other courts have faced the situation presented here and rejected suppression motions that were based on asserted Sixth Amendment violations. For instance, in *United States v. Hudson*, 267 F. Supp.2d 818 (S.D. Ohio 2003), the defendant was stopped by the police in Dayton, Ohio, who searched his vehicle and located a semi-automatic handgun hidden under the passenger-side floor mat. He was charged in state court with carrying a concealed weapon and had counsel appointed. The next day, another officer of the Dayton Police Department who was investigating the defendant's firearms violation, conducted several witness interviews. While the officer was interviewing the witnesses in his police car, the defendant walked past the officer's vehicle.

After the officer finished one of the interviews, the defendant walked back to the officer's car and "peered inside." The officer asked the defendant if he wanted to speak with the officer, and when the defendant said he did, the officer interviewed him. *Id*. at 819.

The defendant in *Hudson* was later charged in federal court with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and moved to suppress statements he made in the interview arguing that his Sixth Amendment rights had been violated. The district court noted that "'if an informant 'deliberately elicits' incriminating statements relating to the charged offense, the defendant is entitled to suppression of those statements in the trial on the charged offense, but the Sixth Amendment raises no bar to the initiation of the interview itself or to the use of any statements that incriminate the defendant on uncharged offenses.'" *Id*. at 820 (quoting *United States v. Ford*, 176 F.3d 376, 380 (6th Cir. 1999). The district court went on to examine the standards set forth in *Texas v. Cobb* and found that the federal charge and the state charge were not the same under *Blockburger*. Accordingly, the court denied the motion to suppress. *Id*. at 820-23; *see United States v. Terrell*, 2005 WL 643464 (D. Kan., Jan. 11, 2005) (court refused to suppress statements made by defendant to a DEA Task Force Officer who questioned him after the defendant was charged in state court with possession with intent to distribute cocaine and a controlled substance tax stamp violation because federal charge of conspiracy to possess cocaine with intent to distribute was not the same offense, so no Sixth Amendment violation).

Here, the defendant's request that the evidence be suppressed notwithstanding that the federal and state charges are not the same is a thinly-veiled attempt to resurrect the discarded theory that the Sixth Amendment applies to charged offenses and those that are "factually

related" to the charged offenses. The Supreme Court squarely rejected the "factually related" theory of Sixth Amendment protection in no uncertain terms in *Texas v. Cobb*. And the rationale for jettisoning it there applies equally here: Suppression here would have the deleterious effect of preventing police from pursuing their fundamental responsibility of protecting the public as well as unduly restricting the societal interest in having law enforcement officers thoroughly investigate uncharged crimes.

      B.      Nothing in the Second Circuit's Decision in *United States v. Mills* Requires the Court to Suppress the Evidence Here.

The defendant argues that the Court must suppress the evidence here because the Second Circuit, in *United States v. Mills*, 412 F.3d 325 (2d Cir. 2005), implied that suppression is the appropriate remedy in a case like this. Defendant divines this from the citation at the end of the *Mills* opinion to the Supreme Court case *Elkins v. United States*, 364 U.S. 206, 208 (1960). Defendant's argument is flawed.

The defendant in *Mills* was charged in state court with illegally possessing a firearm linked to the shooting of a policeman. He later spoke with detectives without counsel. He subsequently was charged in federal court with being a felon in possession of a weapon, in violation of 18 U.S.C. § 922(g), and moved to suppress the statements he had made to the detectives as being given in violation of his Sixth Amendment right to counsel. For purposes of the case, the government did not contest that his right to counsel had attached with respect to the state charges. *Mills*, 412 F.3d at 326. The government also conceded there that the state and federal charges had the same factual elements, except that the federal charge required that the gun have traveled in interstate commerce. *Id*. at 328. The focus of the appeal was whether state

and federal offenses that meet the *Blockburger* same-elements test are nevertheless not the "same offense" for purposes of Sixth Amendment analysis because they are prosecuted by different sovereigns. *Id*. at 330. The Second Circuit rejected the dual sovereignty argument, holding that where there is an identity of offenses, then the Sixth Amendment applies to both charged and uncharged conduct, even if pursued by two different sovereigns.[3] *Id*. at 330.

It was in the context of the dual sovereignty argument that the Second Circuit chose to cite to *Elkins*. In the first instance, it bears emphasizing that *Elkins* was a case that raised concerns arising under the Fourth Amendment, which, unlike the Sixth Amendment, has not been confined to specific charged offenses. Moreover, in *Mills,* the Second Circuit cited to *Elkins* while expressing its concern that where "the same conduct supports a federal or a state prosecution, a dual sovereignty exception would permit one sovereign to question a defendant whose right to counsel had attached, to do so in the absence of counsel and then to share the information with the other sovereign without fear of suppression." *Mills*, 412 F.3d at 330. The *Mills* court did not believe that the Supreme Court's adoption in *Cobb* of the *Blockburger* test was intended to incorporate the dual sovereignty test for Sixth Amendment purposes because, in the Second Circuit's view, that would open up cases having the same elements to manipulation by law enforcement trying to avoid the protections afforded by counsel.

---

[3] The government notes that, on December 12, 2005, the Second Circuit denied its petitions for rehearing and rehearing en banc in *Mills*. The government is currently evaluating whether to file a petition for certiorari asking the United States Supreme Court to review the decision in *Mills*. The government recognizes that this Court is required to follow the holding of the Second Circuit in *Mills* with respect to the government's dual sovereignty arguments previously asserted in this matter. The government simply notes its disagreement with the holding in *Mills*, for the reasons previously articulated, in order to preserve the dual sovereignty argument for any potential future appeal on that issue, should there be an intervening change in the controlling law.

Leaving aside whether such a concern was justified in *Mills* where the essential elements of the state and federal offenses were the same, nothing about the Second Circuit's opinion indicated that it believed the same problems lurked in cases like this one involving state and federal charges having different elements. Were the Second Circuit driven by an overriding concern about law enforcement subterfuge that the defendant seeks to ascribe to it here, then the Second Circuit would not have needed to wrestle with the dual sovereignty issue at all in *Mills*. It simply could have proceeded to the remedy issue and held that, even assuming the charges were not the "same offenses," suppression would be appropriate. But merely to suggest such a course of action demonstrates how wrong it would be constitutionally, as it would result in the imposition of a remedy without a corresponding constitutional violation. It also would fly in the face of the Supreme Court's decision in *Cobb* holding that where the offenses are not the same under *Blockburger*, law enforcement may pursue the important charge of investigating other uncharged crimes. And it would create the type of vague, uncertain restrictions that the Supreme Court eschewed in *Cobb* when it rejected the "factually related" theory used by certain lower courts.

In sum, to read into the *Mills* case a conclusion that the Second Circuit would require the remedy of suppression even where the charged and uncharged offenses were not the same would require a finding that the Second Circuit did not mean what it said when it noted that the same offense test set out in *Cobb* was controlling as to whether there was a Sixth Amendment violation. And it would render puzzling, at best, the fact that the Second Circuit chose to point out that the Supreme Court had rejected in *Cobb* the "factually related" line of cases, 412 F.3d at

329 n.1, as that is exactly the standard the court of appeals would have to apply to find a Sixth Amendment violation here.

      C.      The Court Should Not Create a Sub-Constitutional Limitation on the Conduct of Law Enforcement by Suppressing the Evidence Here Based on its Supervisory Powers, as Law Enforcement Acted Reasonably in Mitigating a Public Safety Threat.

Perhaps recognizing that he cannot establish a Sixth Amendment violation here, the defendant resorts to a claim that the Court should exercise its supervisory powers to exclude the evidence of the interview with Sergeant Pine and Special Agent Campanell as well as the gun. This argument also has no merit. First, this is not the type of situation where it is appropriate for the Court to exercise its supervisory authority. Moreover, the record is clear that the Sergeant Pine and Special Agent Campanell did not engage in any egregious conduct here, but instead were motivated by their desire prevent a potentially dangerous threat to public safety created by the defendant's having abandoned his loaded weapon in a public place from coming to fruition.

The Court's supervisory power is exercised in limited circumstances, and is not a substitute for constitutional analysis. The Second Circuit has held that the court's supervisory authority "does not permit courts to fashion their own 'sub-constitutional' limitations on the conduct of law enforcement officers." *United States v. Myers,* 692 F.2d 823, 847 (2d Cir.1982) *see also United States v. Lau Tung Lam,* 714 F.2d 209, 210 (2d Cir. 1983) ("the federal judiciary's supervisory power over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all"). In *Myers*, the Second Circuit noted that the supervisory power "has not been used as a general corrective authority over the conduct of criminal investigations." *Myers*, 692 F.2d at 847. In *United States v. Payner*, 447 U.S. 727 (1980), the

Supreme Court narrowed the scope of federal court's supervisory powers, rejecting the use of those powers as a substitute for the Fourth Amendment. The Second Circuit, in turn, recognized in *United States v. Ming He*, 94 F.3d 782 (2d Cir. 1996) that "our supervisory authority is not a form of free-floating justice, untethered to legal principle." *Id*. at 792. The Second Circuit went on to say: "Attempts by courts, for example, to use the otherwise broad supervisory authority as a substitute for Fourth Amendment jurisprudence, which adequately safeguards against unlawful searches and seizures, have been rejected. *Id*. (citing *Payner*, 447 U.S. at 735).

In *Ming He*, the court did use its supervisory powers to remedy a standard practice engaged in by a federal prosecutor's office when dealing with cooperating witnesses. But in doing so, it made certain to emphasize that its actions were being directed at the prosecutors, not at law enforcement agents. *Id*. at 792-93. The key distinction of course being, as the Second Circuit pointed out, that prosecutors are members of the court's bar, an area that the courts have traditionally regulated through their supervisory powers. The Second Circuit made clear that its exercise of its supervisory authority was not attempting to "govern the conduct of federal agents whose task is to investigate and prevent criminal activity," and for that reason, the court noted that its holding did not run afoul of the limitations in *Payner* on use of the court's supervisory powers to control agents in criminal investigations. *Id*. at 793.

Here, the defendant is advocating that the Court create a sub-constitutional restriction and apply it to law enforcement officers and agents whose conduct otherwise falls within the proper boundaries of the Constitution. Such a holding here would simply have the effect of punishing law enforcement officers who act in a completely reasonable fashion to prevent potentially drastic harm to members of the public. What should not be lost here is that the defendant's

actions created a significant public safety threat, and he was the one who initiated contact with law enforcement, not the other way around. As Agent Campanell testified:

> [The defendant] wanted to tell us the location of a gun. And it was my impression that he wanted to tell us this so we could go out there and find it before somebody else did, and somebody got hurt. So it was our impression this gun was accessible to the public and it was going to be found if we didn't go out there and get it.

Transcript, February 5, 2004, at 11-12. Similarly, Sergeant Pine testified as follows in response to the question why he wanted to talk to the defendant about the location of the gun:

> Well, it's a loaded gun. It's an extreme threat to the citizens of Norwalk. And basically our charge as a police officer is to protect the public. That's our number one charge. Secondary is to bring criminals to justice. But our primary charge as a police officer is to protect the public. And to get a loaded gun off the street is our primary purpose.

Transcript, January 6, 2004, at 189-90. Sergeant Pine was then asked: "Was it your purpose in approaching Chauncey Moore to discuss with him the circumstances surrounding the shooting incident?" Answer: "No."

Despite the defendant's protestations to the contrary, such conduct by the police neither violated the Sixth Amendment with respect to the separate crimes charged here, nor can it be considered to be "wilful disobedience of the law," as the defendant suggests. To hold otherwise would be directly contrary to the Supreme Court's "offense specific" test for application of the Sixth Amendment and would have the very effect the Supreme Court sought to avoid in *Cobb* – namely, it would create a vague "standard" for police officers and thereby inhibit the dual societal interests in preventing public safety threats from materializing and investigating uncharged crimes. Accordingly, the Court should not suppress the evidence based on its supervisory powers.

15

D.  The "Public Safety" Exception to *Miranda* Applies Here.

Despite the Court's statements that it believes that "public safety" exception to *Miranda* applies here, the defendant takes one last stab at arguing to the contrary.  For all the reasons previously articulated, his contention should be rejected.

As the Supreme Court noted in enunciating the public safety exception, "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect."  *New York v. Quarles*, 467 U.S. 649, 658-59 (1984).  The defendant here cites only one new case, *United States v. Estrada*, 430 F.3d 606 (2d Cir. 2005), which actually upheld the public safety exception.

In *Estrada*, the Second Circuit distilled three general rules of applicability for the public safety exception.  First, "'*Miranda* warnings need not precede 'questions reasonably prompted by a concern for the public safety' or for the safety of the arresting officers,' . . . 'so long as the questioning relate[s] to an *objectively* reasonable need to protect the police or the public from any immediate danger.'"  *Id*. at 612 (citations omitted).  "Second, the exception is limited by the fact that pre-*Miranda* questions, while 'framed spontaneously in dangerous situations,' may not be investigatory in nature or 'designed solely to elicit testimonial evidence from a suspect.'"  *Id*.  And finally, the court recognized that application of the public safety exception will depend on the facts of any particular case, and that a determination of its applicability must be based on the totality of the circumstances.  *Id*.

Here, all these requirements are met.  It cannot be denied that at 2:30 p.m. when the defendant was speaking with Sergeant Pine and Agent Campanell, there was an exigency.  And

that exigency was fresh for those law enforcement officers, given that the defendant had just initiated contact with Sergeant Pine and advised that he had thrown his loaded weapon in a publicly accessible place in Norwalk. That information needed to be acted upon immediately. As noted above, Sergeant Pine, who was not one of the investigators assigned to Moore's state case, testified that his goal in discussing the weapon with the defendant was not to elicit information from him for investigatory purposes, but to get a loaded weapon off the streets before any members of the public harmed themselves or others. Given the totality of the circumstances here, it is clear that there was an objective public safety concern that justified the absence of *Miranda* warnings, even given the passage of time between the defendant's arrest and the questioning at issue.[4] Accordingly, the defendant's statements should not be suppressed.

Because the public safety exception applies, the police were justified in not giving the defendant *Miranda* warnings before following up on his invitation to discuss the matter. For this reason, too, the defendant's argument that somehow the holding in *Texas v. Cobb* on the Sixth Amendment question does not apply here because he did not receive *Miranda* warnings should be rejected. Accepting it would create a tortured exception to the Sixth Amendment "same offense" test which the Supreme Court in no way suggested was appropriate. Moreover, it would cause officers to refrain from acting on their core mission of protecting the public by vigorously

---

[4] The defendant once again cites to testimony from Detective Weisberger to support his claim that the public safety exception should not apply here. Defendant's Supplemental Memorandum at 14. As the Government explained at pages 10-11 of its Reply to the Defendant's Proposed Findings of Fact and Conclusions of Law, dated September 7, 2004, Detective Weisberger's testimony about his interaction with the defendant at around 9:00 a.m. – when the defendant was sleeping and chose not to wake up and speak with the detectives – was a completely different set of circumstances than what faced Sergeant Pine and Agent Campanell later in the day.

pursuing public safety information requiring immediate attention.

The better way to analyze the issue is to recognize that a defendant's Fifth and Sixth Amendment rights to counsel in connection with custodial and post-indictment questioning, respectively, can both be waived by a valid *Miranda* waiver. *Patterson v. Illinois*, 487 U.S. 285, 296-99 (1988). In *Patterson*, the Supreme Court refused to accept that the Sixth Amendment is somehow a superior constitutional right to the Fifth Amendment. *Id*. at 297. As such, when an appropriate, narrow exception to *Miranda* such as the public safety exception applies, it should apply to both Fifth and Sixth Amendment concerns.

If it did not, then dangerous situations would result from bizarre formalistic distinctions. The police would be able to address immediate concerns about public safety – including officer safety – when making an arrest on probable cause, but not when executing an arrest warrant issued pursuant to an indictment, as an indicted defendant would have a Sixth Amendment right to counsel. If such a distinction prevailed then, in cases like *Estrada*, an officer would be allowed to ask an arrestee if he had any weapons without first reading the person his *Miranda* warnings because of concerns for officer safety, but only if the arrest was not pursuant to an indictment. Form would truly take precedence over substance if the law were to insist that an officer put his own or the public's immediate safety on the line in favor of a defendant's Sixth Amendment right where the Supreme Court does not require officers to do so in the Fifth Amendment context. To hold that the public safety exception applies only to the Fifth Amendment would be to elevate the Sixth Amendment right to counsel to an exalted status vis-a-vis the same Fifth Amendment right, something the Supreme Court expressly refused to do in *Patterson*.

In sum, the Supreme Court has carved out an important, narrow exception to *Miranda* when legitimate public safety concerns are at stake, and there is no legitimate basis for holding that it should apply only to Fifth Amendment rights.  *See United States v. DeSantis*, 870 F.2d 536, 539-41 (9th Cir. 1989) (applying the public safety exception to questioning even after defendant, who received *Miranda* warnings invoked Fifth and Sixth Amendment right to counsel; "[s]ociety's need to procure the information about the location of a dangerous weapon is as great after, as it was before, the request for counsel"); *Palmer v. Greiner*, 2003 WL 22019740 at *8-9 (S.D.N.Y., Aug. 22, 2003) (applying public safety exception to Fifth and Sixth Amendment challenges).  Accordingly, the Court should find that the public safety exception applies here to overcome any claim that the defendant's Fifth or Sixth Amendment rights were violated.

## CONCLUSION

For the foregoing reasons, and all the reasons previously presented to the Court, the defendant's motion to suppress should be denied.

    Respectfully submitted,

    KEVIN J. O'CONNOR
    UNITED STATES ATTORNEY

    /s/
    JAMES G. GENCO
    ASSISTANT UNITED STATES ATTORNEY
    FEDERAL BAR NO. ct00360

    For: PAUL A. MURPHY
    ASSISTANT UNITED STATES ATTORNEY
    FEDERAL BAR NO. ct26654
    UNITED STATES ATTORNEY'S OFFICE
    915 LAFAYETTE BOULEVARD
    BRIDGEPORT, CT 06604
    (203)696-3000

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing supplemental memorandum of the United States of America were forwarded by first class mail this 3rd day of February 2006 to:

Gary Weinberger, Esq.
Assistant Federal Defender
10 Columbus Blvd., Fl. 6
Hartford, CT 06106-1976


    /s/_____
JAMES G. GENCO
ASSISTANT UNITED STATES ATTORNEY
FOR: PAUL A. MURPHY
ASSISTANT UNITED STATES ATTORNEY