UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| vs. | :     CRIMINAL NO. 3:03CR178(RNC) |
| CHAUNCEY MOORE | : |

<u>DEFENDANT'S REPLY TO GOVERNMENT'S SUPPLEMENTAL MEMORANDUM</u>

      The Sixth Amendment to the United States Constitution commands that, "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." Based upon its plain language, the United States Supreme Court has held that the Sixth Amendment right to counsel attaches when a "suspect" becomes an "accused." <u>Michigan v. Jackson</u>, 475 U.S. 625, 632 (1985) (when "a person who had previously been just a 'suspect' has become an 'accused' within the meaning of the Sixth Amendment the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation."). The right to counsel does not arise only upon arraignment. "Whatever else it might mean, the right to counsel granted by the Sixth and Fourteenth Amendments means *at least* that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him – 'whether by way of formal charge, preliminary hearing, indictment, *information **or** arraignment*.'" <u>Brewer v. Williams</u>, 430 U.S. 387, 398 (1977) (emphasis added).

      The government has previously conceded that Chauncey Moore was "accused" of the charges against him in the information signed by a State's Attorney, and on the strength of which a Superior Court Judge issued an arrest warrant on September 23, 2002, which commanded the police *inter alia* upon apprehending Mr. Moore immediately to read him the charges contained in said information (a command to "arraign" him de facto). Thus the government previously conceded that Mr. Moore had a right to counsel as to said charges as of the time of his arrest. The government's position in the case at bar was articulated by it as follows in its Proposed Findings Of Fact And Conclusions Of Law filed August 6, 2004:

- 2 -

      The defendant claims that the questioning by law enforcement officers following his arrest on September 24, 2002 violated his Sixth Amendment right to counsel. The defendant's claim is flawed, however, because the right to counsel is offense and prosecution specific. The government notes up front that for purposes of this proceeding only it is no longer claiming that the Sixth Amendment right to counsel did not attach to the pending state charges relating to the shooting incident on September 22, 2002. Even so, the right to counsel did not attach as to the federal charge that was brought eight months later. The federal charge at issue in this case is simply not the same as any of the offenses charged by the state.

In its most recent submission the government has suddenly reversed course, arguing that a recent Connecticut case, State v. Pierre, 2006 WL 176944 (Jan.31, 2006), establishes that Mr. Moore was merely a suspect until his arraignment and that hence he was not an "accused" with a right to counsel until that time. The Connecticut Supreme Court in State v. Pierre relied on its own flawed case of State v. Falcon, 494 A.2d 1190 (1985), but ignored or disregarded controlling United States Supreme Court precedent, including Michigan v. Jackson (see 2 Wayne R. LaFave, Criminal Procedure § 6.4(e), at fn. 75 ("Such decisions as Falcon ... appear to be inconsistent with the Supreme Court's more recent analysis in Jackson....")), in reaching an incorrect conclusion of law which is not binding on this Court.

      The fact that arraignment is not an absolute prerequisite to the attachment of the Sixth Amendment right to assistance of counsel, in a manner particularly pertinent to the case at bar, was presented in the background to McLeod v. Ohio, 381 U.S. 356 (1965). In that case, the Ohio Supreme Court had reconsidered Mr. McLeod's case upon an order of remand from the United States Supreme Court for further proceedings in light of Massiah v. United States, 378 U.S. 582 (1964). The Ohio Supreme Court presented the following situation in its ruling published at 203 N.E.2d 349 (emphasis added):

>       Defendant Joseph T. McLeod ... was indicted on October 3, 1960, for murder in the first degree. On October 11, 1960, before he procured or was assigned counsel, defendant voluntarily made an oral confession in the presence of a deputy sheriff and an assistant prosecuting attorney while riding around in the sheriff's automobile searching for the gun used in the holdup.
>
>       \* \* \*
>
>       In the instant case, defendant's incriminating statements were made by him while he was voluntarily endeavoring to aid the police in securing evidence of the crime. Defendant was not then represented by counsel and had not even requested counsel.

- 3 -

\* \* \*

In the instant case, ***defendant had not yet been arraigned*** and, as hereinbefore indicated, the 'circumstances' under which his incriminating statements were given were wholly different from those in Massiah [v. United States, 378 U.S. 582 (1964)].

The Ohio Supreme Court found no violation of Mr. McLeod's Sixth Amendment right to counsel under the circumstances set forth. The United States Supreme Court thereafter summarily reversed the Ohio Supreme Court. 381 U.S. 356. As stated by the Third Circuit Court of Appeals in United States ex rel. O'Connor v. New Jersey, 405 F.2d 632, 636 (1969):

> By its disposition of McLeod the [United States Supreme] Court has said, in effect, that Massiah commands an absolute right to counsel ... once the indictment has formally stamped the suspect as the defendant; only a clear, explicit and intelligent waiver may legitimate interrogation without counsel following indictment.

The Connecticut Supreme Court in State v. Pierre fails to mention McLeod (nor, for that matter, Brewer v. Williams, which cites McLeod).

The Supreme Court recently revisited this issue in Fellers v. United States, 124 S.Ct. 1019 (2004). A federal grand jury had charged Mr. Fellers and an arrest warrant issued for his arrest on said charges. Police officers went to his home to arrest him on the warrant. They informed him that they had a warrant for his arrest, informed him of the charges and told him that they wanted to talk to him about the charges. Mr. Fellers thereupon made admissions relating to the charges. The officers took him to jail (*but not to court*). At the jail, the officers advised Mr. Fellers of his rights under Miranda. Mr. Fellers signed a Miranda waiver form and then repeated the admissions made at his home. There was no question that Mr. Fellers' Sixth Amendment right to assistance of counsel attached as soon as the grand jury charged him. The Supreme Court unanimously found that which the government previously conceded in this case – that Sixth Amendment right to assistance of counsel attached at the moment Fellers was indicted – and never even paused to discuss that which the government now contends in light of State v. Pierre, i.e, that it would not have attached until he was arraigned. The Connecticut Supreme Court in State v. Pierre makes no mention of Fellers.

The Connecticut Supreme Court in State v. Pierre also fails to acknowledge -- much less discuss and distinguish -- another Connecticut case, State v. Cordova, 448 A.2d 848 (1982). An arrest warrant

- 4 -

supported by an information issued for Mr. Cordova.  He was arrested and brought to court, where he moved to dismiss, claiming that the statute of limitations had expired between the issuance of the warrant and his arrest.  The Connecticut Appellate Court correctly observed regarding Connecticut law that, "[o]ur legal system has developed certain safeguards to protect *an accused* from being prosecuted for stale criminal charges."  Id. at 849 (emphasis added).  Regarding the question critical to the case at bar, the Court determined when it was that Mr. Cordova went from being merely a "suspect" to being "an accused" (Id. at 850):

> Under our law, criminal ***charges are made against an accused upon complaint when an arrest warrant is issued*** upon probable cause.  General Statutes § 54-2a; Practice Book §§ 593, 594.  The offense is specified in the accompanying information signed by the prosecuting authority.  Practice Book § 617.  ***The issuance of the arrest warrant, like the filing of a federal indictment, starts the prosecutorial machinery*** that will provide notice to the accused of the charges against him.  See, e.g., United States v. Grady, 544 F.2d 598, 601 (2d Cir. 1976); United States v. Feinberg, 383 F.2d 60, 64-65 (2d Cir. 1967)(dictum).  After arrest upon execution of the warrant, the defendant must be brought before the court without undue delay. (citations omitted).  Thus, ***by issuing the arrest warrant, with the attached information, the state has filed charges against the defendant that commenced the prosecution*….*

The government's new argument, bolstered by assertions in State v. Pierre, that it is only at arraignment on an information in Connecticut that the "prosecutorial forces of an organized society [have] aligned against the defendant," is refuted by Sheehan v. Colangelo, 27 F.Supp. 2d 344 (D.Conn. 1998); aff'd, 53 Fed.Appx. 584, 2002 WL 31840792 (2d Cir. 2002).  In that litigation, Sheryl Sheehan alleged that Assistant State's Attorney Richard Colangelo of Norwalk violated her civil rights.  According to Ms. Sheehan's complaint, Assistant State's Attorney Colangelo together with Monica Billingslea, a Norwalk police officer, presented a signed information together with an affidavit containing both incriminating and exculpatory evidence to a Connecticut Superior Court Judge.  That Judge did not find probable cause and refused to sign the arrest warrant.  Colangelo thereafter caused Billingslea to draft a new affidavit which omitted the exculpatory evidence.  Colangelo then presented that affidavit to a different Superior Court Judge without informing that Judge about the earlier actions.  The second Judge signed the warrant.  Sheehan claimed in her civil rights action that at the point in time that Colangelo signed the information and obtained the arrest warrant she was still being *investigated*

- 5 -

(i.e., that she was merely a "suspect"), *not prosecuted* (i.e., that she was not yet an "accused"), and therefore Colangelo should have only qualified immunity. Colangelo moved to dismiss, claiming absolute immunity because he was functioning as a prosecutor, not an investigator, in his actions in obtaining the information and arrest warrant. See Imbler v. Pachtman, 424 U.S. 409, 410 (1976) ("a state prosecuting attorney who acted within the scope of his duties *in initiating and pursuing a criminal prosecution*" was not amenable to suit under 42 U.S.C. § 1983) (emphasis added). Judge Eginton agreed, dismissing the action. The Second Circuit upheld Judge Eginton, stating that, "even the deliberate suppression of exculpatory evidence falls within the scope of a prosecutor's adversarial duties" and "a prosecutor's decision whether or not to bring charges is an integral part of the adversarial function." 53 Fed.Appx. at 586.

With all due respect to the Connecticut Supreme Court, the founding fathers chose their words carefully when they wrote the Bill of Rights and courts must pay careful attention to them. The Sixth Amendment's command that, "In all criminal prosecutions, *the accused* shall enjoy the right ... to have the assistance of counsel..." (emphasis added) was precise and purposeful. If one were perhaps in doubt as to the meaning of "the accused," any standard dictionary would inform that "the accused" means "***one charged with an offense***." Those simple meanings unfortunately became lost on the Connecticut Supreme Court in State v. Pierre, which contains the following analysis of Connecticut procedure:

> [W]e agree with the state that a review of the procedure for and contents of an arrest warrant and information, as set out in Practice Book §§ 36 and 37, is instructive. 'The warrant shall be signed by the judicial authority and shall contain the name of ***the accused*** person, or if such name is unknown, any name or description by which ***the accused*** can be identified with reasonable certainty.... It shall state ***the offense charged*** and direct any officer authorized to execute it to ***arrest the accused*** person and to bring him or her before a judicial authority without undue delay.'

Despite the clear language of the Practice Book which they quote and which parallels the Sixth Amendment, the Connecticut Supreme Court, displaying an unfortunate misunderstanding of double jeopardy principles as they apply to prosecutorial discretion prior to jeopardy attaching, opined that the subject of an arrest warrant does not yet have a right to counsel, even after arrest, because a prosecutor could have exercised discretion by withdrawing an unserved arrest warrant and, moreover, could amend

- 6 -

the information at any time prior to jeopardy attaching. The Connecticut Supreme Court in State v. Pierre has exalted form over substance in denigration of the Sixth Amendment right to counsel.

As stated by the United States Supreme Court in Escobedo v. Illinois, 378 U.S. 478 (1964),

> It would **exalt form over substance** to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. Petitioner had, for all practical purposes, already been charged with murder.

Id. at 486 (emphasis added). While the United States Supreme Court later limited the holding in Escobedo to its facts in Kirby v. Illinois, 406 U.S. 682, 689 (1972), those facts are present in the case at bar and its core holding still stands -- courts should not exalt form over substance in determining when the right to counsel accrues. It bears repeating that the arrest warrant in this case, by order of the issuing court, obligated the police (A) to arrest Mr. Moore, (B) *immediately upon arrest to read the charges contained in the multi-count information to him* and (C) to present him in court forthwith. (G-14). It is unknown what the warrant said in that regard in Mr. Pierre's case. But in this case it would be the ultimate exaltation of form over substance to hold that Mr. Moore was merely a suspect while he languished in the Norwalk police lock-up; that he was not "accused" until he belatedly was taken to court.

The government seeks to piggyback on the failure of the Connecticut Supreme Court in State v. Pierre to consider significant United States Supreme Court cases to argue that the Connecticut Supreme Court's determination is somehow binding on this court. They argue based on a footnote in a Ninth Circuit case, United States v. Pace, 833 F.2d 1312 (9th Cir. 1987), that the question of when a state prosecution begins for Sixth Amendment purposes is itself a question of state law. Gov't's Supplemental Memorandum at 3. The government reads the footnote backwards – it was mere dictum regarding what the Ninth Circuit was *not* deciding. In any event, the proposition asserted by the government is fallacious in the face of United Supreme Court precedent (in cases completely ignored by the Connecticut Supreme Court in State v. Pierre). In McLeod v. Ohio, 381 U.S. 356 (1965), which dealt with Ohio law, Brewer v. Williams, 430 U.S. 387 (1977), which dealt with Iowa law, Michigan v. Jackson, 475 U.S. 625, (1985), which dealt with Michigan law, and Maine v. Moulton, 474 U.S. 625

- 7 -

(1985), which dealt with Maine law, the United States Supreme Court never deferred to "state law" to make their determination. This Court should reject out of hand the notion that it is bound by a state decision that ignores United States Supreme Court authority which in part refutes that very suggestion.

The government's arguments regarding Texas v, Cobb, 532 U.S. 162 (2001), and United States v. Mills, 412 F.3d 325 (2d Cir. 2005), misconstrue those cases in ways that are already adequately refuted in the defendant's initial submission. The defendant therefore rests on the arguments previously made regarding same. On the other hand, in the government's arguments regarding the appropriateness of the exercise of supervisory power and the applicability of the "public safety" exception to Miranda the government unfortunately misconstrues both the facts and the law as applicable to those issues in ways that require further explication by way of rejoinder.

To understand what actually happened in this case as it pertains to these issues, it is first of all important to understand what psychologists call "passive aggression." A passive aggressive individual deals with an adversary by masking aggression with passive behavior calculated to provoke the adversary into acting out and thus to create the false impression that the adversary "started it." The Norwalk Police were in a very real sense "passive aggressive" with Chauncey Moore in provoking him to speak and now the government is saying, in essence, "he started it." On Tuesday, September 24, 2002, Norwalk Police Officers discovered, chased and arrested Chauncey Moore in Norwalk near the train station at 6:15 a.m. (T1-50-53). The arresting officers did not advise Mr. Moore of his "Miranda" rights at the time of his arrest (nor did they ask him any questions such as whether he had a firearm or where any firearm might be). (T1-53; 69). He was immediately transported to the Norwalk Police lock-up and turned over to the holding facility (i.e., lock-up) officer William Zavodjancik at approximately 7:00 a.m. (T1-53-54). At 8:50 a.m. Detectives Murray and Weisgerber went to the lock-up to begin the process of getting Chauncey Moore to talk to them about, inter alia, where they could find the firearm they believed that he had used in the attempted armed robbery two days earlier. They found him asleep. They awoke him and informed him of their purpose. (T1-146-50). They opened the cell door, went in with a waist belt and handcuffs and told Mr. Moore that they wanted to take him out and talk with him.

- 8 -

(Id.). Mr. Moore told them that he did not know why he had been arrested. (T1-150; D-Z). Detectives Weisgerber and Murray did not read Mr. Moore the charges in the information (despite the issuing court's mandate that they do so). (T1-150). *Mr. Moore told them that he wanted to be left alone*, anticipating (incorrectly) that he would soon be taken to court. That is, Mr. Moore had been through the system before and therefore knew that as a general rule prisoners in the lock-up by 7:00 a.m. on a work day go to court that same morning. (T1-112-13). Connecticut Superior Court in Norwalk, G.A. #20, was in session on September 24, 2002. (T1-113). At 9:15 a.m., Norwalk Police holding officer Zavodjancik, who was present when Mr. Moore rebuffed Murray and Weisgerber, transported all of the prisoners from the lock-up to G.A. #20 except for Mr. Moore. (T1-82-83; 114). Mr. Moore thereafter asked Officer Zavodjancik why he had not been taken to court, but Zavodjancik claimed at the evidentiary hearing not to remember the exact conversation or his answer. (T1-115). In light of the express judicial mandate in the warrant to present him in court forthwith upon arrest, there was no legitimate answer. It is respectfully submitted that this Court can rely on its common sense to figure out the real answer and why Zavodjancik did not give it to Mr. Moore – the Norwalk police obviously decided to respond to Mr. Moore's request to be left alone by "giving him what he asked for" in the hope that he would relent and speak to them. Their plan worked because it "broke the ice."

By 2:30 p.m. on September 24, Chauncey Moore had been languishing in the Norwalk Police lock-up for 7 and a half hours. Norwalk Police Sergeant Ronald Pine was walking past the lock-up at about 2:30 p.m. when he heard Mr. Moore call out to him. (T1-185). Sergeant Pine had known Mr. Moore for several years. (T1-179). In one important particular instance, back on April 30, 2001, Mr. Moore had given Sergeant Pine information on a homicide Sergeant Pine had been investigating in return for Sergeant Pine arranging for him to be released from custody immediately on a promise to appear, without the need to wait to go to court, on larceny charges for which he had been arrested. (T1-180-81; 203-4). When Sergeant Pine heard Mr. Moore call out to him around 2:30 on September 24, he discovered that Mr. Moore was anxious to get out of the lock-up. (T1-185-86; 208). Mr. Moore asked Sergeant Pine to arrange for his immediate release on a promise to appear. Id. Sergeant Pine told

- 9 -

Mr. Moore that he could not arrange a promise to appear in a case involving a shooting. (T1-186). It is against that factual backdrop that the government makes the errant assertion that Mr. Moore, "was the one who initiated contact with law enforcement, not the other way around." Gov't's Supplemental Memorandum at 15. This Honorable Court should understand and appreciate the true circumstances of Mr. Moore calling out to Sergeant Pine. That is, this Honorable Court should not confuse Mr. Moore's behavior with "voluntary" behavior in coming forward to the police. Rather, the Court should understand that through wrongly leaving him to languish in the lock-up they provoked him into seeking relief in the only way available.

The government's arguments about the narrow "public safety" exception of New York v. Quarles, 467 U.S. 649 (1984), to the requirements of Miranda betray a fundamental misunderstanding of that holding. Suppose a terrorist who is known to have planted a time bomb in a public area has been captured. The police need to find the bomb immediately to save lives. Should they give the terrorist Miranda warnings before asking him where he has planted the bomb? Of course not -- he might heed the warnings and not disclose the bomb's location. Hence, the "public safety" exception to the requirement of Miranda warnings created in Quarles. The Supreme Court explained in Quarles that,

> *if the police are required to recite the familiar Miranda warnings before asking about the whereabouts of the gun, suspects in Quarle's position might well be deterred from responding.* * * * *Here, had Miranda warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles.* Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area. We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings.... * * * As we have in other contexts, we recognize here the importance of a workable rule 'to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.' Dunaway v. New York, 442 U.S. 200, 213-14 (1979). But as we have pointed out, we believe that the exception which we recognize today lessens the necessity of that on-the-scene balancing process.

467 U.S. at 657-58 (emphasis added). It should thus be clear beyond cavil that Quarles does not apply in this case.

- 10 -

The government makes an unfounded claim that when they began to question Mr. Moore about the location of the firearm, "Sergeant Pine and Special Agent Campanell ... were motivated by their desire [to] prevent a potentially dangerous threat to public safety by ***the defendant's having abandoned his loaded weapon in a public place***...." Gov't's Supplemental Memorandum at 13 (emphasis added). The defendant has challenged Sergeant Pine's veracity on cross examination and in prior memoranda, but such challenges aside, his direct examination by the government standing alone refutes the government's present factual assertions in this regard. This Honorable Court will recall that Sergeant Pine testified on direct as follows when asked by the government what he knew at the point in time that he began to engage in conversation with Mr. Moore at 2:30:

> A.   I knew that – I didn't know a lot about the case. I knew that he was arrested. I knew they did not locate any firearms when he was arrested. But I didn't really have much detail other than that.

(T1-185). Sergeant Pine knew that Mr. Moore had *abandoned* the firearm? Moreover, he knew that the firearm Mr. Moore had abandoned was *loaded*? Moreover, he knew that Mr. Moore had abandoned the loaded firearm in a *public place*? That was why he elected not to give Miranda warnings before asking him to disclose the location of the firearm? Those suggestions are simply baseless in light of the actual testimony.

The government argues that, "[b]ecause the public safety exception applies, the police were justified in not giving the defendant Miranda warnings before following up on his invitation to discuss the matter." Gov't's Supplemental Memorandum at 17. What invitation? As explained by Sergeant Pine on direct examination, the *only* "matter" that Mr. Moore wanted to discuss was getting out of a lock-up where he should not have been at that time. Sergeant Pine used the opportunity to speak with Mr. Moore (which the defendant argues was wrongly created in the first place) to convert it into an opportunity to interrogate him about the firearm. Sergeant Pine testified as follows on direct examination regarding the commencement of interrogation during his conversation with Mr. Moore about Mr. Moore's desire to get out of the lock-up:

    A.    I'm not really sure how it came up [in the conversation about Mr. Moore's desire to get out of the lock-up] but, you know, at one point I asked him, well, you know, 'can you tell us where the gun was?'

(T1-186). It is at that precise juncture that this Court must engage in "public safety" analysis because Miranda warnings were otherwise mandated prior to asking that question. "[W]hether exigent circumstances existed should be determined not on the basis of 20/20 hindsight, but rather from the perspective of a reasonable officer on the scene taking into consideration the actual circumstances presented to him at the time he had to make a decision...." United States v. Rush, 248 F.Supp.2d 1121, 1125 (M.D.Ala. 2003). It is respectfully submitted that the government's arguments about "public safety" should be rejected as a *post-hoc* rationalization of Sergeant Pine's failure to give Mr. Moore Miranda warnings prior to asking him where the gun was.

    Sergeant Pine continued on direct examination as follows:

    Q.    And when you asked that question, what did he say?

    A.    He said that he wanted to make a deal, basically. He didn't come up with where the gun was right away. He just said, you know, he wanted a PTA [i.e., to be released on a promise to appear]. I said, 'a PTA is impossible. I can't get you a PTA for a shooting offense.'

(T1-186). Sergeant Pine continued to press Mr. Moore to disclose the location of the gun but Mr. Moore expressed reluctance to do so because he was concerned that it could make his situation worse by creating the potential of a federal firearms charge (a prescient concern if ever there were one, because here we are dealing with that very problem!). (T1-187). Sergeant Pine then informed Mr. Moore that as "luck" would have it there was an ATF agent right outside the lock-up. At that point, after he had already commenced interrogation about the location of the firearm, Agent Campanell was invited to join them. (T1-187). Therefore, the "motivation" of Agent Campanell, who insisted on direct examination that (1) he knew absolutely nothing about Mr. Moore prior to being invited by Sergeant Pine to join them (T2-7) and (2) said nothing to Mr. Moore (T2-9), is irrelevant to the "public safety" analysis.

- 12 -

There is an old adage that if the facts are against you, argue the law; if the law is against you, argue the facts; and if both the law and the facts are against you, pettifog. The government's argument regarding this Court's supervisory powers brings to mind that adage. The government does not dispute the fact that Norwalk Police Department was under court order to bring Mr. Moore to court without undue delay. They simply ignore that fact. The government does not dispute that in McNabb v. United States, 318 U.S. 332, 341 (1943), the United States Supreme Court held that where federal agents interrogated defendants without arraigning them promptly as ordered by federal statutes its "supervisory authority over the administration of criminal justice in the federal courts" required the court to exclude the evidence obtained in that interrogation. They simply ignore that statement of the law. Mr. Moore has argued that because the government is seeking to use the fruits of the Norwalk Police investigation, this case must be viewed as though federal agents disregarded an express and explicit directive of this Court to present Mr. Moore in court forthwith upon arrest and exploited their omission by inveigling the location of the firearm without advising Mr. Moore of his right to counsel and obtaining a knowing, voluntary and intelligent waiver thereof. See United States v. Sorenson, 330 F.2d 1018, 1020 n.1 (2d Cir. 1964) ("the admissibility of the ... [evidence so obtained] is to be judged *as if the conduct were that of federal officers.*" (emphasis added). The government has pettifogged around that assertion by microscoping to Sergeant Pine and Agent Campanell and arguing that those two individuals were engaged in the noble pursuit of "public safety." Not only is that a factually spurious claim for the reasons set forth above, it is unresponsive because it was the Norwalk Police department in general and Officer Zavodjancik in particular – certainly not Agent Campanell -- who disobeyed the court's order. This issue turns on whether this Court believes that Officer Zavodjancik acted purposefully in not transporting Mr. Moore to GA #20 at 9:15 a.m. on September 24, 2002. It is respectfully submitted that Officer Wong Won was truthful when he swore that he informed Officer Zavodjancik of the warrant. It is further respectfully submitted that Officer Zavodjancik purposefully left Mr. Moore to languish in the lock-up after Mr. Moore rebuffed Detectives Murray and Weisgerber but was unwilling to admit to his dereliction in court for fear of the civil consequences that could follow such an admission.

- 13 -

<u>Conclusion</u>

Mr. Moore stands by his position that all statements taken and evidence obtained on September 24, 2002, were obtained in violation of his Sixth Amendment right to assistance of counsel and must, therefore, be suppressed. It is furthermore his position that even if the Supreme Court's holding in <u>Texas v. Cobb</u> were applicable to this case because it could be interpreted to mean that the fruits of a Sixth Amendment violation under certain circumstances can be used to prosecute separate albeit factually intertwined offenses, the Court should nevertheless suppress under its supervisory powers under the peculiar facts of this case. Finally, it remains his position that all statements taken on September 24, 2002, were obtained in clear violation of his rights under <u>Miranda</u> and must, on that alternative basis, be suppressed.

The undersigned counsel hopes that the supplemental memoranda have adequately addressed the Court's questions.

                                           Respectfully submitted,

                                           The Defendant,
                                           Chauncey Moore

                                           Thomas G. Dennis
                                           Federal Defender

Dated: February 17, 2006        /s/
                                           Gary D. Weinberger
                                           Asst. Federal Defender
                                           10 Columbus Blvd, FL 6
                                           Hartford, CT  06106-1976
                                           Bar No. ct05085
                                           (860) 493-6260
                                           Email: gary.weinberger@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing memorandum has been mailed to Paul A. Murphy, Assistant United States Attorney, United States Courthouse, 915 Lafayette Boulevard, Bridgeport, CT 06604, on this 17 day of February 2006.

                                           /s/
                                           Gary D. Weinberger