```
                   UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :
                              :
V.                            :   NO. 3:03-CR-178 (RNC)
                              :
CHAUNCEY MOORE                :
                              :
```

RULING AND ORDER ON MOTION TO SUPPRESS

Defendant Chauncey Moore is charged with unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). The firearm at issue was recovered by Norwalk police from the roof of a house in Norwalk, where it had been thrown by the defendant. The defendant revealed the firearm's location to the police in response to questioning following his arrest on state charges. After the firearm was recovered, the defendant made further incriminating statements concerning his purchase and possession of the firearm.

The defendant has moved to suppress his post-arrest statements, as well as the firearm itself, on the grounds that they were obtained in violation of his rights under the Fifth and Sixth Amendments. The Government contends there was no such violation. For reasons set forth below, I conclude that the motion to suppress should be granted in part and denied in part.

I.  FACTS

Based on the evidence presented at the suppression hearing, I make the following findings of fact.

On September 23, 2002, an assistant state's attorney for Norwalk presented an information and application for an arrest

warrant to a judge of the Connecticut Superior Court charging the defendant with attempt to commit felony murder (2 counts), criminal use of a firearm (2 counts), attempt to commit first degree robbery (2 counts), conspiracy to commit first degree robbery (2 counts), first degree reckless endangerment, robbery involving an occupied motor vehicle, and third degree assault.  A supporting affidavit established probable cause to believe that the defendant had committed these offenses in Norwalk the previous day in connection with an attempted armed robbery and subsequent carjacking in which shots were fired.  The judge granted the application and issued the arrest warrant at 4:00 p.m.

That night, at about 11:15 p.m., Officer Mark R. Suda spotted the defendant walking on South Main Street in Norwalk. Suda chased the defendant but soon lost sight of him.  During the defendant's flight, he threw a handgun onto the roof of a house at 75 South Main Street, which is in a high-crime area.  Suda did not see the defendant discard the gun.  After giving up the chase, Suda searched the path of the defendant's flight but found nothing.[1]

Based on an informant's tip, the defendant was apprehended in Norwalk the next morning, September 24, at about 6:15 a.m.

---

[1] Officer Suda was aware of the warrant for the defendant's arrest because it had been discussed at the briefing of patrol officers at the start of the 11:00 p.m. shift.  The defendant was well known to the Norwalk police.  He had been arrested there sixteen times in the previous thirteen years.

Nobody gave him Miranda warnings or tried to question him at that time. Instead, he was taken directly to police headquarters and placed in a cell in the lockup sometime before 7:00 a.m. The return on the arrest warrant was signed by Officer Sean Wong-Won. He did not realize that by signing the form, he was attesting to having read the charges in the warrant to the defendant, which in fact had not been done.

At about 8:30 a.m., the supervisor of the detective unit, Sergeant Mattera, assigned Detectives Arthur Weisberger and Michael Murray to go to the lockup to try to interview the defendant concerning the charges for which he had been arrested. The two detectives went to the defendant's cell, found him sleeping, woke him and tried to get him to talk. He told them he didn't know why he had been arrested, then rolled over and went back to sleep. The detectives did not disturb him any further.

At about 9:15 a.m., Officer William Zavodjancik, who was in charge of the lockup during the day, took several arrestees to court for arraignment. As a general rule, arrestees placed in the lockup by 7:00 a.m. on a weekday could expect to be processed and taken to court the same morning. The defendant was not taken to court that morning because Officer Zavodjancik lacked information concerning the charges against the defendant, which he needed in order to process the defendant before taking him to court.[2]

---

[2] To process an arrestee, Officer Zavodjancik had to
(continued...)

When Officer Zavodjancik returned to the lockup at about 10:00 a.m., he found a file on his desk containing the information he needed to process the defendant. The file had not been there before. He then processed the defendant but made no attempt to take the defendant to court then or later that day. As a result, the defendant was not arraigned until the next day.

The defendant contends that Officer Zavodjancik purposefully failed to transport him to court, in violation of the arrest warrant's directive that he be brought to court "without undue delay," so that he could be questioned outside the presence of counsel. I disagree. There is no evidence that anyone asked Officer Zavodjancik to refrain from taking the defendant to court, nor any evidence to suggest that Officer Zavodjancik would engage in such a subterfuge. On the record before me, I find that Officer Zavodjancik engaged in no deliberate wrongdoing as alleged by the defendant.

Officer Zavodjancik routinely checked on prisoners in the lockup every half hour. When he checked on the defendant shortly after noon, the defendant asked to speak with a detective.

---

[2](...continued)
generate a computerized report containing, among other things, an accurate statement of the pending charges. Had he known the defendant had been arrested pursuant to a warrant, and been able to locate the warrant in the building, he could have processed the defendant using the information contained in the warrant in time for the defendant to be taken to court that morning. He was unaware of the warrant, however. Officer Wong-Won testified that he thinks he told Officer Zavodjancik about the warrant, but Zavodjancik specifically testified that he did not know about the warrant and I find his credible testimony persuasive on this point.

Zavodjancik called the detective bureau and left a voicemail message concerning the defendant's request. The next time Zavodjancik checked on the defendant, the defendant repeated his request to speak with a detective. Zavodjancik responded that he had already called the detective bureau and left a message but would do so again. He then called a second time and left another message.

Not long after that, at about 2:00 p.m., the defendant asked to use a pay phone. Officer Zavodjancik moved the defendant to a booking cage in the lockup that was equipped with a pay phone and left him there. The defendant then placed one or more calls outside the presence and hearing of Zavodjancik.

At about 2:30 p.m., Sergeant Ronald Pine, a narcotics supervisor who had been with the Norwalk police for twenty-five years, was walking near the booking cage when the defendant saw him and called out to him by name. The defendant had dealt with Pine in connection with some of his previous arrests. Pine knew that the defendant had been arrested in connection with an incident in which shots were fired and that the gun used in the incident had not been recovered. He had no other information about the case, however, nor any involvement in the case, and did not know the defendant was in the lockup until he heard the defendant call his name.

Pine approached the defendant and asked, "What's up?" The defendant said he needed Pine's help getting released on a promise to appear. On a previous occasion, when the defendant had been

arrested on larceny charges, Pine had arranged for the defendant's release on a promise to appear in exchange for information concerning a homicide Pine was investigating.  On learning that this was why the defendant had called out to him from the booking cage, Pine said there was no way the defendant could be released on a promise to appear because the pending charges involved an incident in which shots were fired.

    The evidence concerning who said what next is not entirely clear.  I find, however, that within a few minutes Pine asked if the defendant could tell him where the gun was.  The Government contends that Pine asked this question in response to the defendant's disclosure that he had discarded the gun in a public place and was concerned that it created a public danger.  The Government's version is consistent with Pine's written report of his encounter with the defendant, which was prepared soon after the event.[3]  At the suppression hearing, however, Pine testified that he was unable to recall who raised the subject of the gun, or how the subject of the gun came up, and no attempt was made to refresh his recollection using his written report.  In these circumstances, I decline to rely on the report.[4]  Putting the report aside, there is no evidence that the defendant volunteered any information about the gun before Pine asked if the defendant

---

    [3] According to Pine's report, the defendant called out to Pine from the booking cage and, when Pine approached and asked what the defendant wanted, the defendant said he wanted to tell Pine where he had thrown the gun.  See Govt. Ex. 17.

    [4] The Government contends that the report is accurate but offers no explanation for failing to use it at the hearing.

6

could tell him where the gun was.

In response to Pine's question, the defendant stated that he was reluctant to disclose the location of the gun. Pine said that if the defendant told him where the gun was, he would urge the state's attorney to give the defendant credit for doing the right thing. The defendant responded by stating that he did not want to face a federal gun charge.

While the defendant and Pine were talking, Pine saw Agent Ron Campanell of the Federal Bureau of Alcohol, Tobacco and Firearms and asked him to join them. Agent Campanell was working with Norwalk police as part of a federal/state initiative relating to firearms offenses. Pine introduced the defendant to Campanell and told him he would have a chance to talk with the Agent after they recovered the gun but that they needed to get the gun first.

The defendant then told Pine and Campanell that he had thrown the gun onto the roof of a restaurant in Norwalk. Pine asked the defendant to draw a map pinpointing the gun's location and he proceeded to do so with Pine's help. The map made it clear to Pine that the gun had been thrown onto the roof of the house located at 75 South Main Street. After the map was drawn, Pine told the defendant that detectives would want to interview him later concerning the pending charges. He urged the defendant to cooperate with them.

With the map in hand, Pine and Campanell drove to 75 South Main Street. Standing at the rear of the property, they could

see the defendant's gun on the roof of the house. Detectives Weisberger and Murray were called to the scene to take possession of the gun. They arrived and took photographs of the gun on the roof. Weisberger then retrieved the gun by crawling through a window in a common hallway of the house, which provided access to the roof. The gun proved to be loaded.

After the gun was recovered, Pine told Weisberger that the defendant wanted to speak with detectives. Weisberger and Murray then returned to police headquarters to process the gun and interview the defendant.

The detectives arrived at the defendant's cell in the lockup at about 4:05 p.m. The defendant indicated that he was willing to speak with them about the pending charges. They then moved the defendant to a nearby interview room, where they were joined by Agent Campanell.

The detectives told the defendant he was in serious trouble, handed him an advice of rights and waiver form, and stated that if he cooperated with them, his cooperation would be brought to the attention of the state's attorney and the state court. The defendant knew by then that the charges against him included attempted murder, and he had decided it was in his best interest to cooperate. He read the advice of rights and waiver form aloud, initialed each paragraph, and signed the form at about 4:15 p.m.

The detectives proceeded to question the defendant for about 45 minutes. He was asked where he got the gun. He said he

bought it on the street in Norwalk for $25.  He was asked if he knew others in Norwalk who had guns.  He provided hearsay information about a number of people but no specifics.  The questioning then turned to the subject of cold case homicides in Norwalk.  Again, the defendant provided little or no specific information.  Finally, the defendant was asked about the events of September 22, 2002.  He briefly discussed his actions that day, emphasizing that when he fired the gun he did not intend to kill anyone.  However, he declined to make a written statement about the pending charges without first speaking with an attorney.  The detectives then terminated the interview and returned the defendant to his cell in the lockup.

On September 25, 2002, the defendant was arraigned on the state charges detailed in the information.  The United States Attorney subsequently decided to bring a federal prosecution.  On June 18, 2003, the defendant was indicted by a federal grand jury for unlawful possession of a firearm.  The state charges are no longer pending.

II.  DISCUSSION

    A.  Fifth Amendment

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that unless police inform a suspect in custody of his Fifth Amendment rights before subjecting him to interrogation, any statements elicited from the

suspect will be inadmissible at trial.  Id. at 492. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  The burden is on the Government to demonstrate that a statement made by a defendant in response to interrogation was obtained in compliance with the Miranda rule or one of its exceptions.  See Miranda, 384 U.S. at 479.

    1.   Unwarned Statements

The Government contends that the defendant's statements to Sergeant Pine concerning the location of the gun are admissible under the public safety exception to the Miranda rule, which permits officers in dangerous situations to ask "questions necessary to secure their own safety or the safety of the public." New York v. Quarles, 467 U.S. 649, 659 (1984).  The exception applies "only where there are sufficient indicia supporting an objectively reasonable need to protect the police or the public from immediate harm." United States v. Estrada, 430 F.3d 606, 614 (2d Cir. 2005).  The exception is highly fact specific and therefore requires consideration of the totality of the circumstances.  See United States v. Reyes, 353 F.3d 148, 152 (2d Cir. 2003).

After careful consideration, I find that the evidence presented by the Government falls short of establishing an exigency covered by the public safety exception.  The Government

has not shown that when Pine asked the defendant about the location of the gun, a threat to public safety necessitated immediate questioning without the benefit of Miranda warnings. Rather, it appears that Pine pressed the defendant to reveal the gun's location although he had no specific information from the defendant (or any other source) that the gun was loaded and had been abandoned in a public place where it could be found at any moment by third parties.  In response to Pine's repeated urging, the defendant eventually revealed that he had thrown the gun onto the roof of a restaurant in downtown Norwalk.  Even this disclosure fell short of establishing an objectively reasonable need to continue to question the defendant without complying with Miranda, for it provided no reason to believe that the gun was loaded and accessible to members of the public.  Accordingly, I conclude that the Government has failed to sustain its burden of showing that the defendant's unwarned statements are admissible under the public safety exception.  See Orozco v. Texas, 394 U.S. 324 (1969)(shooting suspect's unwarned statements in response to police questioning concerning location of gun four hours after shooting occurred inadmissible under Miranda).[5]

    2. Warned Statements

    The defendant contends that the statements he made in the

---

[5] In Quarles, the Supreme Court distinguished Orozco by pointing out that the latter case involved no exigency requiring immediate action by the police.  See Quarles, 467 U.S. at 659 n.8.  On the record before me, I find the same is true here. This ruling does not affect the admissibility of the gun itself. See United States v. Patane, 542 U.S. 630 (2004).

interview after the gun was recovered should be suppressed on the ground that his earlier unwarned statements compromised the voluntariness of his later statements. The Government urges that the warnings given at the start of the interview should be found to have functioned effectively to inform the defendant of his rights to silence and counsel, as Miranda requires. I agree with the Government.

Under Oregon v. Elstad, 470 U.S. 298 (1985), an arrestee who makes an incriminating statement in response to unwarned but uncoercive questioning may later waive his rights after receiving the required warnings and make a second statement that can be used against him. In such a case, the admissibility of the subsequent statement depends on a number of factors, including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Missouri v. Seibert, 542 U.S. 600, 615 (2004).

Here, the defendant initiated the conversation with Sergeant Pine, after twice requesting to speak with detectives, and voluntarily answered Pine's questions about the location of the gun. Pine's failure to administer Miranda warnings was unaccompanied by any attempt to question the defendant about the charges for which he had been arrested. The formal interrogation conducted by Detectives Weisberger and Murray nearly two hours

12

later covered different subjects: the defendant's acquisition of the gun, the identities of others in Norwalk who illegally possessed firearms, unsolved homicides in the Norwalk area, and the circumstances of the shooting incident that led to the defendant's arrest.  Agent Campanell was present for part of the first session and all of the second, but he asked no questions during the first and relatively few if any during the second.  As far as the record shows, the detectives' questioning of the defendant did not include repeated references to the defendant's session with Pine.  Moreover, the defendant eventually did invoke his right to counsel in response to the detectives' questioning.

In these circumstances, it is reasonable to conclude that the Miranda warnings given at the outset of the formal interrogation by the detectives could function effectively to inform the defendant of his rights to silence and counsel.  This leaves the issues of the voluntariness of the defendant's waiver and subsequent statements.[6]  It is undisputed that the defendant read aloud and initialed the advice of rights form, and willingly answered all questions until he invoked his right to counsel.  Based on these facts, I find that his waiver and subsequent

---

[6] See Seibert, 542 U.S. at 612 n. 4 ("In a sequential confession case, clarity is served if the later confession is approached by asking whether in the circumstances the Miranda warnings given could reasonably be found effective.  If yes, a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate Miranda warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning.").

13

statements were voluntary.  Accordingly, the statements can be used against him.[7]

### B. Sixth Amendment

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have assistance of counsel for his defense."  U.S. Const. amend. VI. "The Sixth Amendment right to counsel is triggered at or after the time that judicial proceedings have been initiated . . . whether by way of formal charge, preliminary indictment, information, or arraignment."  Fellers v. United States, 540 U.S. 519, 523 (2004) (internal quotations omitted).  Once it attaches, police may not use as evidence at trial incriminating statements that are deliberately elicited from the defendant outside the presence of counsel unless the defendant has waived his right to counsel.  See id. at 524-25.

The defendant contends that his Sixth Amendment right to counsel attached when the state's attorney submitted the information to the state court in support of the application for an arrest warrant and that his statements to Pine and the

---

[7] The defendant contends that his waiver and statements were involuntary because Pine told him to cooperate with the detectives and promised he would not be charged federally.  Pine testified that he urged the defendant to cooperate with the detectives but did not instruct him to do so and made no promises concerning federal charges.  I credit his testimony on these points.  To the extent the defendant alleges that Pine promised him leniency if he talked, "vague promises of leniency for cooperation . . . generally will not, without more, warrant a finding of coercion."  United States v. Gaines, 295 F.3d 293, 299 (2d Cir. 2002).

14

detectives outside the presence of counsel should therefore be suppressed (along with the gun).  The Government initially assumed that the defendant's right to counsel did attach when the information was submitted in support of the application for the arrest warrant.  In State v. Pierre, 277 Conn. 42 (Jan. 31, 2006), however, the Connecticut Supreme Court decided that in state criminal prosecutions, the Sixth Amendment right to counsel does not attach when a prosecutor signs an information but only when the information is filed with the court at the time of the defendant's arraignment.  The defendant contends that Pierre is wrongly decided.  But the Second Circuit has held that the Sixth Amendment right to counsel does not arise on an arrest pursuant to a complaint, which is essentially what occurred here.  See United States v. Duvall, 537 F.2d 15, 22 (2d Cir. 1976) (Friendly, J.).  I conclude, therefore, that at the time the defendant was questioned by Pine and the detectives, his Sixth Amendment right to counsel had not yet attached.

The Government contends that even if the prosecutor's submission of the information as part of the arrest warrant package triggered the defendant's Sixth Amendment right to counsel on the state charges, he is not entitled to the relief he seeks.  I agree.  Because the Sixth Amendment right to counsel is "offense-specific," McNeil v. Wisconsin, 501 U.S. 171, 175 (1991), use of incriminating statements elicited from a defendant outside the presence of counsel is prohibited only with regard to charges as to which the right has attached.  See Texas v. Cobb,

15

532 U.S. 162, 168 (2001)("[A] defendant's statements regarding offenses for which he ha[s] not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses."). In Cobb, the Court held that when the Sixth Amendment right to counsel attaches to a charged offense, it also encompasses offenses that would be considered the same under the test of Blockburger v. United States, 284 U.S. 299 (1932), which provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304. Under this test, the federal and state charges at issue here are not the same.[8] Since the charges are different, the defendant's Sixth Amendment right to counsel did not attach to the federal charges until his indictment in 2003, nearly nine months after his statements to Sergeant Pine and the detectives. See United States v. Gidden, No. 02-CR-947, 2003 WL 22992077, at *3 (E.D.N.Y. Dec. 16, 2003) (Weinstein, J.).

The defendant contends, finally, that the police improperly delayed his arraignment by not taking him before a judge the

---

[8] The pending federal charges require proof of prior felony convictions. These elements are not part of any of the state charges contained in the information that gave rise to the defendant arrest. Moreover, the only state charge that is even arguably similar to the federal charges – criminal use of a firearm – requires using or threatening to use a firearm in the commission of a felony, an element not present in the federal charges.

16

morning of his arrest.  He argues that the delay violated the arrest warrant, which required the police to present him in court without undue delay.  He also argues that the police delayed his arraignment in order to interrogate him without a lawyer.  On the basis of these allegations, he urges that his statements should be suppressed.

The defendant's argument is unavailing.  "A delay in arraignment, without more, does not require the exclusion of a voluntary confession."  Quartieri v. Mann, No. 95-2687, 1996 U.S. App. Lexis 10448, at *3-4 (2d Cir. May 6, 1996) (unpublished); see also United States v. Rubio, 709 F.2d 146, 153 (2d Cir. 1983); United States v. Burgos, 579 F.2d 747, 750 (2d Cir. 1978). The delay in this case, although not trivial, was not so excessive as to warrant the remedy of exclusion. See State v. Piorkowski, 43 Conn. App. 209, 217 (1996) (holding that under Connecticut statutory law a defendant "must be brought before the next session of the court, excluding any session held on the day of his arrest."); Rubio, 709 F.2d at 153 (upholding the district court's refusal to exclude a statement made by a defendant after a federal arrest but before his arraignment two days later); Burgos, 579 F.2d at 750 (lapse of fifteen hours between defendant's federal arrest and his appearance before a magistrate judge did not require the exclusion of his confession).  As explained above, moreover, I do not agree that Officer Zavodjancik purposefully left the defendant to languish in the lock-up so he could be interrogated outside the presence of

counsel and coerced into confessing.

III.    <u>CONCLUSION</u>

    For the foregoing reasons, the amended motion to suppress is granted in part and denied in part.

    Dated at Hartford, Connecticut this 20th day of February 2007.

```
           _____/s/_____
                Robert N. Chatigny
              United States District Judge
```